IN THE UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| NIGEL POTTER; | : | CR 03-81-01ML |
| DANIEL BUCCI; and | : | (Superseding Indictment) |
| BURRILLVILLE RACING ASSOCIATION | : | |
| a/k/a LINCOLN PARK | : | |
| a/k/a LINCOLN GREYHOUND PARK | : | |
| a/k/a LINCOLN PARK, INC. | : | |

**DEFENDANTS NIGEL POTTER'S, DANIEL BUCCI'S AND LINCOLN PARK, INC.'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF INTRODUCTION OF JANUARY 25, 2001 AUDITOR'S LETTER**

On January 25, 2001, Skip Sherman sent a letter to Ernst & Young, LLP (*Potter Exhibit OO*) certifying that he knew of no "violations or possible violations of law in any jurisdiction" (*id.* at p. 3, ¶ 3) and no "fraud involving management" (*id.* at p. 4, ¶ 2) in any of three identified time frames:

(1) "as of December 24, 2000" (*id.* at p. 1, ¶ 1);

(2) "since December 24, 2000" (*id.* at p. 4, ¶ 3); and

(3) "pending" (*id.*).

He testified that he knew that "[a] decision regarding a Wembley subsidiary that you [Sherman] called illegal" had "occurred in December." Tr. 2/14 @ 118 (attached). He testified that he continued to know about this plan, and to consider it illegal, from December 2000 through January, 2001. He said he placed the issue on the agenda for the January 24, 2001 Wembley USA Board because he was concerned about its illegality. And he testified that, at the January 24, 2001 meeting, Nigel Potter confirmed that the McKinnon proposal had been approved.

Contrary to all this testimony, however, *Potter Exhibit OO* shows that Mr. Sherman offered a professional opinion to Wembley's auditors (Ernst & Young) that there was no "violation of possible violation" of law involving "fraud" that was then "pending" – *i.e.*, pending as of the date of the letter, January 25, 2001. Defendants are entitled to impeach Mr. Sherman by placing this letter into evidence.

The Law

Impeachment by prior inconsistent statement is a standard and essential component of cross-examination. *E.g., Udemba v. Nicoli,* 237 F.3d 8 (1st Cir. 2001); *see, gen'ly,* 2 Graham, *Handbook of Federal Evidence,* § 613.1, p. 323, *et seq. (2001).* Prior inconsistent statements need not be directly contradictory. *McCormick* states the standard test as follows: "[C]ould the jury reasonably find that a witness who believed the truth of the facts testified to would have been unlikely to make a prior statement of this tenor?" *McCormick, Evidence,* § 34 at p. 127 (5th ed. 1999). *Wigmore* is much the same: "Do the two expressions appear to have been produced by inconsistent beliefs?" 3A Wigmore, *Evidence,* § 1040 at p. 1048 (Chadbourn rev. 1970). "The cross examiner is permitted to show the discrepancy [between the witness's testimony and his/her prior statements] by extrinsic evidence if necessary – not to demonstrate which of the two is true, but, rather, to show that the two do not jibe (thus calling the declarant's credibility into question)." *United States v. Wickenbaach,* 197 F.3d 548, 558 (1st Cir. 1999).

The Law Applied

In this instance, the impeachment goes to the very heart of the testimony of the government's key witness; indeed, it addresses the very point for which the government has put Mr. Sherman on the witness stand.

Mr. Sherman has testified that, on the date he made his certifications to company auditors, he believed management had planned something illegal. The auditor's letter says the opposite:

> "There have been no violations or possible violations of laws or regulations in any jurisdiction whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency."
>
> *Potter Exhibit OO* at p. 3

By definition, one records a "loss contingency" against an impact in a future year. Hence, in making this representation, Mr. Sherman was swearing to the auditors that he knew of no "violation or possible violations of laws" which could have an impact on a future year.

Further, this letter asserts that "[t]here has been no fraud involving management or employees who have significant roles in internal control ...." *Potter Exhibit OO* at 4. This representation is not limited by the impact on any given financial year. The issue is whether there has been fraud, not whether the impact will occur during the year at issue. Indeed, the financial impact of fraud commonly occurs well after the event, and can be quantified only as prosecutions or lawsuits are filed and then conclusion. The letter represents the absence of fraud, not the absence of a current impact. Finally, the letter states the following:

> "No events or transactions *have occurred since December 24, 2000 or are pending* that would have a material effect on the financial statements at that date or for the period then ended, or that are of such significance in relation to the Company's affairs to require mention in a note to the financial statements in order to make them not misleading regarding the financial position, results of operations, or cash flows of the Company."

*Id.* Thus, the letter states that it includes events which "have occurred since December 24, 2000" or are "pending" which:

- would have a material effect on the financial statements as of December 24, 2000 or for the period ended, or
- are of such significance to require mention in a note to the financial statements.

This is a representation which is separate from the preceding ones. Its plain purpose is to ensure that nothing has occurred since December 24, 2000 that would substantially alter the representations being made for the current year. It is not intended to limit the scope of those representations, but to augment them.

Applied here, Mr. Sherman has testified that he believed that in the year 2000, senior management had agreed to perpetrate a fraud on the Rhode Island public, to do something that was illegal. He has stated that the impact of such action quite literally could be devastating on Wembley USA and Lincoln Park. The government's own evidence establishes that Mr. Sherman was aware that the Bucci proposal was being discussed as of November 30, 2000 and that within a short time thereafter, his budget was adjusted to account for this payment. Mr. Sherman admitted that he knew of this plan in December. Tr 2/14 @ 118 (attached). He further has testified that he understood this budget adjustment created authority to spend that money.

In these circumstances, if Mr. Sherman's testimony is to be credited, then he was well aware of the "violations or possible violations of laws" and "fraud involving management" that he was required to report to the Company's auditors, regardless of the year of ultimate financial impact. The fact that he certified that no such violations of law or fraud existed materially contradicts his assertion that he told Mr. Potter and Mr. Elliott something very different just the day previously.

Hearing this evidence, a jury could very fairly conclude that, if Mr. Sherman had indeed been warning Mr. Potter about the illegality of the McKinnon payment on January 24, 2001, he would have been unlikely to have certified the absence of illegality on January 25, 2001. Absent

this evidence, however, the jury will be unable to assess the true import of Mr. Sherman's testimony. For this reason, defendants have a right to present this evidence, not simply under F.R.Evid. 613, but under the Sixth Amendment as well.

Respectfully submitted,
NIGEL POTTER
By his Attorneys,

C. Leonard O'Brien (E.T.)
C. LEONARD O'BRIEN, ESQ. (#1886)
B. JEAN ROSIELLO, ESQ. (#2886)
MacFadyen, Gescheidt and O'Brien
The Owen Building
101 Dyer Street
Providence, RI 02903

Respectfully submitted,
DANIEL BUCCI
By his Attorney,

Anthony Traini (E.T.)
ANTHONY M. TRAINI (#4793)
56 Pine Street
Providence, RI 02903

Respectfully submitted,
LINCOLN PARK, INC.
By its Attorneys,

John Tarantino (E.T.)
JOHN A. TARANTINO (#2586)
PATRICIA K. ROCHA (#2793)
Adler, Pollock & Sheehan P.C.

One Citizens Plaza, 8th Floor
Providence, RI 02903

## CERTIFICATE OF SERVICE

I certify that on the 29th day of JULY, 2005 I caused a copy of this document to be HAND-DELIVERED to Craig N. Moore and Lee H. Vilker, Assistant United States Attorneys, The Fleet Center, 50 Kennedy Plaza, 8th Fl., Providence, RI 02903.

________________________

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | C.R. NO. 03-081ML |
| UNITED STATES OF AMERICA * | |
| VS. * | JULY 21, 2005<br>9:00 A.M. |
| NIGEL POTTER, ET AL * | |
| * * * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

DISTRICT JUDGE

(Jury Trial)

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | CRAIG N. MOORE, ESQ.<br>LEE H. VILKER, ESQ.<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI 02903 |
| FOR THE DEFENDANT,<br>NIGEL POTTER: | C. LEONARD O'BRIEN, ESQ.<br>101 Dyer Street<br>Providence, RI 02903 |
| FOR THE DEFENDANT,<br>DANIEL BUCCI: | ANTHONY M. TRAINI, ESQ.<br>56 Pine Street<br>Providence, RI 02903 |
| FOR THE DEFENDANT,<br>BURRILLVILLE: | JOHN A. TARANTINO, ESQ.<br>PATRICIA ROCHA, ESQ.<br>Adler, Pollock & Sheehan, Inc.<br>One Citizens Plaza, 8th Floor<br>Providence, RI 02903 |
| Court Reporter: | Karen M. Zinni, RPR-RMR-CRR<br>One Exchange Terrace<br>Providence, RI 02903 |

recall that question? I'll start it over. "Is it the truth that you said that to Mr. Potter, sir?"

A. Yes.

Q. Do you recall that question? And do you recall answering that question, "It's the truth that I said it to Mr. Tarantino, yes"?

A. Mr. Tarantino asked me if it was potentially illegal, I said yes, not to Mr. Potter.

Q. Isn't it a fact, sir, what Mr. Tarantino asked you, he asked you what did you tell Mr. Potter; correct?

A. Yes, in the transcript.

Q. And your answer is, I told Mr. Potter, among other things, that I felt it was potentially illegal?

A. I'm not sure if Mr. Tarantino asked me the question did I tell Mr. Potter it was potentially illegal. I'm not sure how -- I responded yes.

Q. You agree when you were speaking to Mr. Tarantino you told Mr. Tarantino you were telling him the truth?

MR. MOORE: Objection.

THE COURT: Sustained.

Q. You do agree, do you not, sir, that when you spoke to Mr. Tarantino, it was one year after the meeting of January 24th, 2002 (sic); correct?

MR. MOORE: Objection.

THE COURT: Overruled.

A. Correct.

Q. And that this was part of the process of determining whether Wembley PLC's finances were being handled in an appropriate manner; correct?

A. Correct.

Q. I meant to say Wembley USA.

A. Thank you. Yes.

Q. But you do understand with my substituting the word "Wembley USA," do you not?

A. Yes.

Q. And certainly you had an obligation as the chief executive officer of Wembley USA to make sure that things were done appropriately?

A. Correct.

Q. Financially?

A. Correct.

Q. You also had an additional responsibility to protect its assets?

A. Correct.
Q. That is, to make sure that it didn't run into problems that would reduce its profitability?
A. Correct.
Q. For instance, as a firm running gaming establishments, it had to have a license to run those gaming establishments; correct?
A. Correct.
Q. And engaging in improper activity would cause a potential loss of those licenses; correct?
MR. MOORE: Objection.
THE COURT: Overruled.
A. I don't know about improper activity.
Q. Well, you recognized that protecting a license was a substantial interest for Wembley USA?
A. Yes.
Q. And that that was part of your responsibility to see that that was done as an executive of Wembley USA?
A. Correct.
Q. You also recognized that day, you say, that something had occurred in December; correct?
A. Correct.
Q. A decision regarding a Wembley USA subsidiary that you called illegal; correct?
A. Correct.

Q. And you recognized that if a company like Wembley USA or one of its subsidiaries operated illegally, that could have the effect of endangering the license of Wembley USA and that subsidiary; correct?
A. That's correct.
Q. Now, you recognized this as something that had occurred in December of 2002 (sic); correct?
A. Correct.
Q. This wasn't just -- you're saying today this wasn't just something you thought was potential, you thought it was illegal; correct?
A. Yes. I thought carrying this act out would be illegal.
Q. Now, you didn't know exactly what the money was for for Mr. McKinnon, did you?
A. It wasn't for legal expenses.
Q. Well, you had not been told what it was for, had you?
A. No.
Q. You didn't say anything to the auditors, did you?
A. No.
MR. O'BRIEN: Your Honor, I'm going to tie up relatively quickly, but I'd like to approach the bench on a matter that I'm going to bring into evidence, but