UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v. CR No. 03-081ML

NIGEL POTTER;
DANIEL BUCCI; and
BURRILLVILLE RACING ASSOCIATION
a/k/a LINCOLN PARK
a/k/a LINCOLN GREYHOUND PARK,
a/k/a LINCOLN PARK, INC.

# MEMORANDUM AND ORDER

This matter is before the Court on Defendants' motions for judgment of acquittal and renewed motions for judgment of acquittal, all of which are made pursuant to Rule 29 of the Federal Rules of Criminal Procedure. For the reasons discussed below, the motions are denied.

## I. BACKGROUND

On September 9, 2003, a federal grand jury indicted Defendants Nigel Potter ("Potter"), Daniel Bucci ("Bucci"), and Burrillville Racing Association ("Lincoln Park") on various counts of honest services wire fraud in violation of 18 U.S.C. §§ 1341 and 1346 and conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 371. Trial commenced on January 31, 2005. At its conclusion, the jury found Potter and Bucci not guilty with respect to one count of wire fraud each and found Lincoln Park not guilty with respect to three counts of wire fraud. The jury, however, was hung on all remaining counts and the Court declared a mistrial as to those charges.

During the first trial, Defendants moved for a judgment of acquittal at the close of the

government's case. Defendants renewed their motions following the close of all evidence and again after the jury returned its verdicts. On each occasion, the Court reserved decision pursuant to Rule 29(b). On March 1, 2005, the Court denied Defendants' motions and renewed motions, finding sufficient evidence for a reasonable jury to convict Defendants on all counts in the indictment.

Retrial began on July 19, 2005. After the government rested, Defendants moved for a judgment of acquittal, incorporating their arguments from their Rule 29 motions in the first trial and further asserting that the evidence submitted during retrial was insufficient to convict Defendants of any charges alleged in the indictment. The Court heard oral argument on the motions and reserved decision. Defendants renewed their motions for judgment of acquittal at the close of all evidence, and the Court again heard oral argument and reserved decision.

On August 8, 2005, after approximately two days of deliberation, the jury returned its verdicts. Potter was found guilty on Counts I, III, V, and X. Potter was found not guilty on Counts VII and VIII. Bucci was found guilty on Counts I, II, IV, VI, and IX. Bucci was found not guilty on Counts XI and XII. Lincoln Park was found guilty on Counts I, VI, and IX. Lincoln Park was found not guilty on Counts XI and XII. Defendants once more renewed their motions for judgment of acquittal after the verdicts were announced. The Court again reserved decision on the motions.

## II. DISCUSSION

Defendants' motions for judgment of acquittal are moot with respect to those counts on which the jury returned a verdict of not guilty. Accordingly, the Court considers the motions only with respect to those counts on which Defendants were convicted, specifically, Counts I, III,

V, and X as to Potter, Counts I, II, IV, VI, and IX as to Bucci, and Counts I, VI, and IX as to Lincoln Park.

A. Defendants' Original Motions for Judgment of Acquittal

Under Rule 29 of the Federal Rules of Criminal Procedure, the court, on a defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The court must determine "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000) (quoting United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)).

When a motion for judgment of acquittal is made during trial, the court may reserve decision until after the jury returns a verdict, however it must decide the motion on the state of the evidence as it existed at the time the ruling was reserved. Fed. R. Crim. P. 29(b). Consequently, the Court will consider only the evidence submitted by the close of the government's case when addressing Defendants' original motions for judgment of acquittal.

1. Count I – Conspiracy

Count I of the indictment charges Defendants with conspiring to commit honest services wire fraud in violation of 18 U.S.C. § 371. Specifically, Count I alleges that Defendants conspired with each other to devise a scheme to defraud the State of Rhode Island and its citizens of the honest services of John B. Harwood ("Harwood" or "John Harwood"), the then Speaker of the Rhode Island House of Representatives, and to transmit or cause to be transmitted facsimile communications ("faxes") through interstate and foreign commerce for the purpose of executing

that scheme.

To establish a violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: (1) the existence of a conspiracy; (2) the defendant's knowledge of the conspiracy; (3) the defendant's willful participation in the conspiracy; and (4) the commission of an overt act in furtherance of the conspiracy. See United States v. Sawyer (Sawyer I), 85 F.3d 713, 742 (1st Cir. 1996). A defendant's willful participation in the conspiracy is demonstrated by an intent to agree to the conspiracy and an intent to effectuate the underlying offense. Id.; United States v. Yefsky, 994 F.2d 885, 890 (1st Cir. 1993). "Neither the agreement nor [the defendant's] participation in it need be proven with direct evidence." Sawyer I, 85 F.3d at 742.

The Court finds that the evidence presented by the government during its case in chief, when viewed in the light most favorable to the government, is sufficient to sustain a conviction as to all Defendants of conspiring to commit honest services wire fraud. The evidence, taken in the light most favorable to the government, establishes that Bucci, the General Manager of Lincoln Park, and Potter, the Chief Executive Officer ("CEO") of Wembley PLC, Lincoln Park's ultimate parent company, and a member of Lincoln Park's board of directors (Gov't Ex. 115), had been business associates for several years prior to the summer of 2000. At that time, Lincoln Park, and specifically the video lottery terminals ("VLTs" or "machines") operated at Lincoln Park, provided nearly ninety percent of Wembley PLC's profits. The government submitted evidence that the installation of additional VLTs or new coin-operated slot machines was dependent upon approval from the Rhode Island House of Representatives among other legislative bodies.

By the middle of 2000, Bucci reported to both Potter and Francis "Skip" Sherman

("Sherman"), the CEO of Wembley USA, the holding company that owned Lincoln Park and was itself wholly owned by Wembley PLC. As part of the reporting relationship, Bucci and Potter exchanged a number of faxes in late 2000 and early 2001 regarding a potential multi-million dollar payment to Lincoln Park's law firm, McKinnon & Harwood. In the faxes, Bucci and Potter expressed an expectation that a payment to the law firm would advance Lincoln Park's political goals, notably legislative approval of coin-operated slot machines and additional VLTs at Lincoln Park, and the defeat of any legislation that would permit the Narragansett Indian tribe to open a casino. McKinnon & Harwood's principal partners included Daniel V. McKinnon ("McKinnon"), who acted as Lincoln Park's general legal counsel, and John Harwood, the then Speaker of the Rhode Island House of Representatives.

The payment to McKinnon & Harwood was first referenced in a fax from Bucci to Potter and Sherman on August 21, 2000. Bucci wrote that he sensed "a yet unspoken undertone that we [at Lincoln Park] are acquiring the reputation of being ungrateful" and he commented that "[w]hen the last large award of machines was granted by the LOT; [sic] Newport [Jai-Alai]'s law firm received a $1,000,000 'performance bonus[.]'" (Gov't Ex. 17.) He continued:

> We face the immediate necessity of continued support to advance slots, additional machines, and silence the Indians. No one. [sic] No one, has suggested to me that a quid pro quo is essential.
>
> We should, however, clearly understand that our supporters are the ones who took the brunt of the media assaults and produced the results; [sic] while much "lesser lights" are receiving financial awards.
>
> We have benefited [sic] to the tune of hundreds of millions of additional revenues over the last eight years and have encountered virtually minimal expenses. I wonder if its [sic] reasonable to assume that we are represented by people who believe it is incumbent upon us to reflect gratitude.
>
> I think its [sic] time we had a discussion about this. Like I said earlier, no one has articulated this to me. But, a wink is as good as a nod to a blind man. I've just been around too long.

(Id.)

The payment to McKinnon & Harwood was openly discussed for the first time at a meeting of the board of directors of Wembley USA on August 25, 2000. Bucci, Potter, Sherman, and David Brents, ("Brents"), Wembley USA's then Chief Financial Officer ("CFO"), attended that meeting. At the meeting, Bucci advocated that McKinnon receive a $1 million "performance bonus" in order for Lincoln Park to maintain its political relationships. Sherman objected to such a payment. Potter remained silent during the discussion of making a payment to McKinnon.

Potter was scheduled to visit Lincoln Park in mid-September. On September 5, 2000, Potter sent a fax to Bucci suggesting that Bucci invite McKinnon to a dinner with Potter, Bucci, and Claes Hultman, who at that time was the Chairman of the Wembley PLC board of directors. Potter, Bucci, and Hultman had dinner with McKinnon in Rhode Island on September 13, 2000. Afterwards, Potter sent Bucci a fax in which he expressed his hope that Bucci found the dinner with McKinnon to be "useful." (Gov't Ex. 22.)

On November 29, 2000, and November 30, 2000, Bucci and Potter met in Rhode Island to review a number of items relating to Lincoln Park and its management. After the meeting, Potter and Bucci exchanged a series of faxes in which they discussed, among other things, the amounts and contours of the payment to McKinnon & Harwood. In his December 1, 2000, fax to Bucci, Potter summarized the topics covered at the November meeting. Potter noted that he "endorse[d]" Bucci's strategy to obtain 1000-1500 new VLTs or slot machines in 2001 and that the "areas critical to the success" of this strategy included the "Lottery Commission[,]" the "House[,]" and the "Senate." (Gov't Ex. 35.) Potter and Bucci also "agreed" that McKinnon

was an important element to this strategy's success. (Id.) Potter then wrote:

> I suggested (following your requests for recognition of McKinnon [sic] past contribution as well as further commitment) that we should pay McKinnon's law practice a 'retainer' [sic] of $500k in 2001 and 2002. If the strategy is successful and extra machines (1000+) are implemented in 2002 we would consider increasing the retainer to $1 [million] for each of 2003/2004/2005. Similarly if no additional machines are achieved then the $500k [per annum] for 2001 and 2002 would cease.

(Id.) Later that day, Bucci responded to Potter with a fax of his own, in which he agreed in substance to Potter's proposal, but opposed the suggested payment structure:

> The only item that needs some further clarification for me is McKinnon... My understanding was that commencing [January 1, 2001] they would receive [one-twelfth] of [$500,000] every month for the next 2 years... I think that's also your view... I thought that you agreed, if during this 2 year period, we received approval for 1,000 or more machines that the payment would escalate to $1 [million] at once, not at the conclusion of 2002...

(Gov't Ex. 37.)

On December 4, 2000, Potter replied to Bucci and reiterated his desire to tie the payment to McKinnon & Harwood to the installation, rather than the approval, of the additional machines. He wrote: "I am happy to bring forward McKinnon's reward if we achieve an extra 1000+ machines but only when those machines are installed and generating revenue." (Gov't Ex. 38.) He also noted: "I think we are speaking the same language." (Id.) When responding to this fax on December 5, 2000, Bucci again expressed his disagreement with Potter's proposed payment structure, stating: "There is no real incentive to escalate passage of the machines under your plan, with the intense media scrutiny.... Your scheme is not prudent in this situation." (Gov't Ex. 39.) However, Bucci also commented: "As long as we are on the same page, I'll follow your instructions." (Id.)

Potter later wrote to Bucci on December 7, 2000. In this fax, Potter stated: "I am not sure how you think we are so far adrift on the strategy for extra machines in terms of incentive philosophy. All I am trying to be certain of is that we are all quite clear about what we are spending, how we are spending it and what we expect in return." (Gov't Ex. 43.) He then asked Bucci for a precise proposal regarding the terms of the payment.

Bucci responded by asking Potter, in a December 11, 2000 fax, what specific payment structure would be approved. "It is my understanding that effect [sic] 01.01.2000 [sic] the law firm will be receiving 12 monthly payments of $41,666 for the calendar year 2001... And that you will resolve the question[:] if 1000+ machines are granted when does this rate double???" (Gov't Ex. 48.) Potter replied the next day with the following message:

> I am happy that the McKinnon payments are as we agreed when we met and which you reiterated in your note to me of last Friday, i.e. $500,000 a year in 2001 and 2002 followed by $1 [million] a year for the next three years (or sooner if machines installed [sic] prior to 31/12/2002) subject to the receipt of permission to install at least 1,000 extra VLT or slot machines.

(Gov't Ex. 49.)

Following this exchange of faxes, the subject of a payment to McKinnon & Harwood was raised once again at a January meeting of the Wembley USA board of directors. In attendance were Potter, Sherman, Brents, and Mark Elliott ("Elliott"), who at that time was Wembley PLC's CFO. Sherman and Brents testified that they again objected to the payment when it was mentioned at this meeting. Sherman testified that Potter informed them that the Wembley PLC board had already approved the payment. Brents testified that Potter told them it was a "done deal."

This evidence, and in particular the faxes exchanged between Bucci and Potter in early

December 2000, when taken in the light most favorable to the government, establishes the existence of a conspiracy to devise a scheme to defraud Rhode Island citizens of the honest services of John Harwood. A reasonable jury could conclude that these two individuals agreed to offer McKinnon & Harwood a six- or seven-figure sum in order to secure more VLTs, to receive approval for new coin-operated slot machines, and to thwart any legislative efforts to permit an Indian casino, and that they intended this payment to influence Harwood in the exercise of his honest services. Defendants agreed that the law firm would initially receive $500,000 per year in 2001 and 2002. Potter and Bucci simply quibbled over the exact point at which the payments to McKinnon & Harwood would increase to $1 million per year. A reasonable jury could find that this evidence established the existence of a conspiracy.

A reasonable jury could find, from the contents of the faxes alone, that Defendants knew of the conspiracy and its objectives. After all, it was Defendants themselves who offered the McKinnon payment as a means to facilitate the achievement of Lincoln Park's legislative goals. Bucci first suggested the McKinnon payment in a fax on August 21, 2000, and at the August 25, 2000, Wembley USA board meeting and Potter communicated in detail with Bucci about the payment in numerous faxes.

A jury also could reasonably conclude that Defendants willfully participated in the conspiracy as they manifested both an intent to agree and an intent to effectuate the underlying offense. Bucci's willful participation is evident from the many faxes in which he asked Potter to approve the payment to McKinnon & Harwood. In these faxes, Bucci asserted that Lincoln Park must offer a substantial sum of money to McKinnon & Harwood if it wanted to achieve its political goals. A jury therefore could find that Bucci both intended to commit honest services

wire fraud and intended to agree to commit this act with Potter. Potter's willful participation could be found by a reasonable jury as well, particularly when considering the very words he wrote to Bucci. It was Potter himself, in his December 1, 2000, fax, who suggested that the payment to McKinnon & Harwood explicitly be linked to the legislative approval and installation of additional VLTs or slot machines at Lincoln Park.

Finally, the government introduced sufficient evidence for a rational factfinder to conclude that each of the overt acts listed in the indictment were committed in furtherance of the conspiracy. The jury had before it the numerous faxes sent by Bucci and Potter discussing the McKinnon payment. The jury also could have found that Potter's attendance at the late November meeting with Bucci, the January 12, 2001, Wembley PLC board meeting at which a $600,000 "retainer" for McKinnon & Harwood was included in the 2001 Wembley USA budget, or the January 24, 2001, Wembley USA board meeting satisfied the overt act requirement.

As the evidence submitted by the government, when taken in the light most favorable to the government, establishes (1) the existence of a conspiracy to commit honest services wire fraud, (2) Defendants' knowledge of and willful participation in the conspiracy, and, (3) the commission of a number of overt acts in furtherance of the conspiracy, a reasonable jury could have convicted Defendants on Count I.

<u>2. Counts II, III, IV, V, VI, IX, and X – Honest Services Wire Fraud</u>

Counts II, III, IV, V, VI, IX, and X of the indictment charge Defendants with the commission of honest services wire fraud in violation of 18 U.S.C. §§ 1341 and 1346. The indictment alleges that Defendants "devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right of the honest services

of John B. Harwood by paying money to the law firm of McKinnon & Harwood over a period of years so as to improperly influence and affect the official action of John B. Harwood. . . ." Specifically, the indictment claims that Defendants sought to cause Harwood to use his influence, appointment power, and authority to obtain Rhode Island Lottery Commission authorization for the installation of coin-operated slot machines and 1,000 additional VLTs at Lincoln Park and to prevent legislation allowing the Narragansett Indian Tribe to develop a casino in Rhode Island.

In order to sustain a conviction of honest services wire fraud, the government must establish beyond a reasonable doubt: "(1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of . . . interstate [or foreign] wire communications in furtherance of the scheme." United States v. Woodward, 149 F.3d 46, 63 (1st Cir. 1998) (quoting Sawyer I, 85 F.3d at 723), cert. denied, 525 U.S. 1138 (1999). The term "scheme or artifice to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The requirement that the defendant act with the specific intent to defraud encompasses both an intent to deprive the public of the honest performance of the public official's services and an intent to deceive the public. United States v. Sawyer (Sawyer II), 239 F.3d 31, 41 (1st Cir. 2001); Woodward, 149 F.3d at 55; Sawyer I, 85 F.3d at 729. One example of an intent to deprive the public of an official's honest services is "a bribery-like, corrupt intent to influence official action . . . ." Sawyer I, 85 F.3d at 730.

As set forth below, the evidence introduced by the government in its case, when viewed in the light most favorable to the government, would support a rational jury's finding Defendants guilty on all counts of honest services wire fraud of which they were convicted.

a. Scheme to Defraud

The government introduced evidence pointing to the existence of a scheme to defraud the citizens of Rhode Island of the honest services of John Harwood. As discussed supra, a reasonable jury could conclude from the numerous fax communications exchanged between Potter and Bucci, particularly those which were sent in early December 2000, that Defendants devised a scheme to defraud by planning to pay several million dollars to the law firm of the Speaker of the Rhode Island House of Representatives in exchange for legislative approval of additional VLTs or new coin-operated slot machines. On Bucci's behalf, this scheme could be found to have been in existence as early as August 2000, when Bucci first proposed the payment to McKinnon. On Potter's behalf, the scheme could be found to have been devised if not by September 13, 2000, when Potter, Bucci, and McKinnon met at dinner, then at least by November 30, 2000, when Potter and Bucci agreed to pay the law firm $500,000 in 2001 and 2002 and $3 million more if the legislature approved extra machines.

The government must also establish Defendants' intent to deprive the public of Harwood's honest services. Defendants argue that the government failed to establish this element because, Defendants insist, there is no evidence of what Harwood's official acts included and therefore there is no evidence of what his honest services were. Without evidence of Harwood's specific honest services, Defendants contend that, under the analytical framework for honest services wire fraud set forth in Sawyer I, it is impossible for a jury to determine what it was that Rhode Island citizens were deprived of. To the contrary, the government insists that it is not required to introduce evidence of Harwood's actual honest services because the only relevant consideration is whether Defendants themselves intended to deprive the public of what they

believed those services to be. The government argues that Sawyer I should be distinguished on the basis that it is an honest services wire fraud case dealing with gratuities, whereas the case before the Court concerns an alleged quid pro quo bribery scheme.

In Sawyer I, the First Circuit noted that the "broad scope of the mail fraud statute . . .does not encompass every instance of official misconduct that results in the official's personal gain" and cited, as examples, the Eighth Circuit's opinions in United States v. McNeive, 536 F.2d 1245, 1246 (8th Cir. 1976), and United States v. Rabbitt, 583 F.2d 1014, 1026 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979)[1]. Sawyer I, 85 F.3d at 725.

> The McNeive and Rabbitt cases illustrate that although a public official might engage in reprehensible misconduct related to an official position, the conviction of that official for honest-services fraud cannot stand where the conduct does not actually deprive the public of its right to her honest services, and it is not shown to intend that result. Similarly, if a non-public-official is prosecuted for scheming to defraud the public of an official's honest services, the government must prove that the target of the scheme is the deprivation of the official's honest services. If the "scheme" does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented.

Id. As Potter, Bucci, and Lincoln Park are non-public officials, the government must therefore establish that "the target of the scheme is the deprivation of the official's honest services," or, if the scheme does not necessarily deprive the public of honest services, it must establish, by

---

[1]McNally v. United States, 483 U.S. 350 (1987) overturned a line of cases relying on the intangible rights theory, including, but not limited to, Rabbit and United States v. Von Barta, 635 F.2d 999 (2nd Cir. 1980), cert. denied, 450 U.S. 998 (1981) (cited below). See generally Belt v. United States, 868 F.2d 1208, 1212 n.3 (11th Cir. 1989); Ingber v. Enzor, 841 F.2d 450 (2d Cir. 1988). McNally held that § 1341 "did not reach schemes to defraud citizens of their intangible right to the honest government services of their public officers." Sawyer II, 239 F.3d at 39. Congress responded by enacting § 1346. Id. The First Circuit has recognized that § 1346 was intended to overturn McNally and "reinstate the reasoning of pre-McNally case law. . . ." Sawyer I, 85 F.3d at 723-24.

independent evidence, "the intent to deprive another of those services . . . ." Id.

The cases cited by the Sawyer I court on this point are not particularly helpful when applied to the specific factual scenario presently before the Court. Both McNeive and Rabbitt involve the prosecution of a public official, rather than non-public officials like Potter, Bucci, and Lincoln Park. See McNeive, 536 F.2d at 1246; Rabbitt, 583 F.2d at 1018-21.[2] The defendants in United States v. Von Barta, 635 F.2d 999, 1005-06 n.14 (2d Cir. 1980), cert. denied, 450 U.S. 998 (1981), and United States v. D'Amato, 39 F.3d 1249, 1252 (2d Cir. 1994), while private individuals, were charged with defrauding their private employers of their own honest services.[3]

Because the law is not entirely clear as to whether the government must introduce specific evidence of a public servant's official acts when it nonetheless has introduced evidence of a non-public official's intent to deprive the public of what he believes those acts to be, the Court will apply the more stringent standard advocated by Defendants. Even under this heightened standard, the Court finds that the government introduced sufficient evidence of Harwood's official duties.

The government submitted evidence that the installation of additional VLT machines and new coin-operated machines at Lincoln Park was subject to the approval of the Rhode Island legislature. This evidence can be found in the following sources: Sherman's testimony; Potter's

---

[2]Two other post-Sawyer I honest services wire fraud decisions in the First Circuit also involve convictions of public officials as opposed to non-public officials. See Woodward, 149 F.3d at 55, 57-62; United States v. Czubinski, 106 F.3d 1069, 1076-77 (1st Cir. 1997).

[3]The Von Barta case was also before the court on a motion to dismiss the indictment, to which a markedly different standard of review is applied.

December 1, 2000, fax to Bucci, in which he wrote that the "House" and "Senate" must "concur with the need for extra machines" (Gov't Ex. 35); and the stipulation entered by the government that "the General Assembly had legislative authority over gambling matters in the state...."[4] (Gov't Ex. 149.) The government submitted evidence that any future operation of a casino by the Narragansett Indians in Rhode Island was also subject to the approval of the legislature. This evidence is derived from Sherman's "Major Risks" memorandum, in which he wrote: "The current statutes require that any gambling initiatives, before 2002, must be placed on the ballot by the Legislature. There is no easy way for the Indians to go directly to the voters and bypass the Legislature." (Gov't Ex. 3.)

A jury could also rationally conclude that one of Lincoln Park's primary political goals, namely the installation of additional machines, additionally required the approval of the Lottery Commission, the majority of whose members were appointed by the Rhode Island legislature. This evidence can be drawn in part from Potter's December 1, 2000, fax, which states that the "Lottery Commission" must "concur" with the decision to allot machines (Gov't Ex. 35), and Bucci's "Legislative Update" fax to Sherman on January 22, 2001, which Potter included in a fax of his own to Sherman on January 30, 2001. (Gov't Ex. 54.) In this latter fax, when referring to the approval of additional machines at Lincoln Park, Bucci stated: "Extra machines is [sic] obviously in the lap of the Lottery Commission and not the Legislature. But, six of the nine

---

[4]The stipulation, in its entirety, reads that "as the General Assembly had legislative authority over gambling matters in the state–including those at Lincoln Park–John Harwood did not vote on any matters involving or affecting Lincoln Park." (Gov't Ex. 149.) According to Defendants, the stipulation establishes that Harwood did not have the ability to vote on legislation concerning Lincoln Park. However, it is unclear whether the stipulation discusses Harwood's past or current voting practices and in any event, the stipulation only relates to one aspect of Harwood's official duties, as discussed <u>infra</u>.

members are appointed by the legislative branch.” (Id.) The government therefore submitted evidence that any additional machines at Lincoln Park were subject to the authorization of the Lottery Commission, that the Lottery Commission was composed of nine members, and that six of the nine members were appointed by the legislative branch.

A rational jury could further conclude, after drawing all inferences in the light most favorable to the government, that the support of the leadership of the legislative branches affected the approval of additional machines at Lincoln Park. This evidence also can be drawn from Bucci’s January 22, 2001, “Legislative Update” fax. In this fax, Bucci commented on the political hurdles facing Lincoln Park’s agenda for installing additional machines. Bucci summarized Lincoln Park’s efforts at obtaining legislative approval for these machines: “We have never faced quite such a unique balancing act that requires simultaneous cooperation with the Lottery Commission, the [Lincoln] Town Council, the *Legislative leadership*, and the State budget authors.” (Id. (emphasis added).) A reasonable jury could therefore infer that, because the installation of additional machines at Lincoln Park required the “cooperation” of the leadership of the legislature, the official duties of these leaders included the ability to influence such legislation.

Taking all of this evidence and the reasonable inferences to be drawn from such evidence, together with the fact that Harwood served as the Speaker of the Rhode Island House of Representatives, a jury could rationally conclude that it was within Harwood’s official capacity to influence the legislative approval of Lincoln Park’s political goals. The evidence demonstrates that Harwood was not only a member of the Rhode Island House of Representatives, one of the legislative bodies entrusted with authority over Lincoln Park’s

political goals, but its Speaker and leader. As Speaker, his "cooperation" was required to effectuate passage of any additional machines at Lincoln Park.

The evidence, when viewed in the light most favorable to the government, also demonstrates that Defendants intended to influence Harwood in the exercise of official power by paying him several million dollars if Lincoln Park received legislative approval for additional machines, thereby depriving the public of his honest services.

Most significant are the early December 2000 faxes between Potter and Bucci in which the substantial increase in the payment to McKinnon & Harwood was expressly dependent on legislative approval of 1,000 to 1,500 additional machines. According to Potter's December 1, 2000, fax to Bucci, Defendants were to pay "*McKinnon's law practice*" $500,000 in 2001 and 2002 irrespective of any other considerations, but these payments would increase to $1 million in 2003, 2004, and 2005 only if "the strategy is successful and extra machines (1000+) are implemented in 2002.... Similarly if no additional machines are achieved then the [$500,000 per year] for 2001 and 2002 would cease." (Gov't Ex. 35 (emphasis added).) Notably, this description of the proposed payment plan followed a discussion by Potter of the "areas critical" to obtaining additional machines, two being the "House" and the "Lottery Commission," both of which must "concur with the need for extra machines." (Id.) In later faxes, Potter was concerned with determining "what we are spending...and what we expect in return" (Gov't Ex. 43), and he reiterated that the increased payments to the firm were "subject to the receipt of permission to install at least 1,000 extra VLT[s] or slot machines." (Gov't Ex. 49.) Bucci echoed these comments, stating that he would "prefer that the incentive give *them* the 'push' for 2001 *approval*" of 1,000 new machines (Gov't Ex. 37 (emphasis added)), and reminding Potter that

"we're here for the long run [and] these folks (and their designees) are going to be in power for the next [four] years plus." (Id.) Defendants therefore conditioned the dramatic increase in the payments to McKinnon & Harwood upon legislative approval of new machines and explicitly stated their intention that the payments effectuate such legislative action. A reasonable jury could thereby infer that Defendants viewed Harwood, the then Speaker of the Rhode Island House of Representatives, as the key to obtaining legislative approval of additional machines and that they intended their payments to his firm to result in such approval.

Thus, when considering all of the evidence introduced during the government's case in the light most favorable to the government, a reasonable jury could find that (1) Lincoln Park's VLT revenue generated approximately 90 percent of the total profits of Lincoln Park and Wembley PLC; (2) that the number of extra machines sought by Defendants would have nearly doubled Lincoln Park's capacity and would therefore generate proportional profits for Lincoln Park; (3) that Defendants believed Harwood to be capable of influencing approval of legislation concerning Lincoln Park; and, (4) that Defendants explicitly conditioned the $3 million increase in the payment to McKinnon & Harwood on legislative approval of additional machines. When considered alongside evidence that the cooperation of legislative leadership was a necessary element to succeeding in gaining legislative approval of additional machines at Lincoln Park, a rational jury could find that Defendants intended to deprive the public of Harwood's honest services.

There also exists sufficient evidence for a reasonable jury to find that Defendants intended to deceive the public. When discussing the payment to McKinnon & Harwood, Bucci and Potter referred to it with a number of different labels, including "bonus," "retainer,"

"reward," and "incentive." Additionally, the payment as approved by the Wembley PLC board of directors for inclusion in the Wembley USA 2001 budget is referred to as a "retainer/legal expenses." A rational jury could thereby conclude that Defendants sought to conceal the true nature of the payment to McKinnon & Harwood by labeling it as ordinary legal fees. This conclusion, combined with the reasonable determination that Defendants intended to influence Harwood in his official capacity, is sufficient to lead a reasonable jury to find that Defendants devised or intended to devise a scheme to defraud the public of Harwood's honest services.

b. Use of Wires in Furtherance of the Scheme

The government also submitted evidence from which a reasonable jury could find that Defendants used interstate or foreign wires in furtherance of the scheme for each of the counts on which they were convicted.[5]

The government introduced the faxes that are the subject of the honest services wire fraud counts of where the jury returned a verdict of guilty as to Defendants Bucci and Lincoln Park, namely Counts II, IV, VI, and IX for Bucci and Counts VI and IX for Lincoln Park. Each of these faxes carries a fax line indicating that they were sent from Lincoln Park's offices in Rhode Island. Because each fax discusses the specific arrangement of the payment to McKinnon & Harwood, a reasonable jury could conclude that they were sent in furtherance of the scheme to defraud. Specifically, in the fax described in Count II, Bucci suggested that a "six-figure check" be given to McKinnon & Harwood in order to further Lincoln Park's political objectives. (Gov't Ex. 24.) Count IV concerns a fax in which Bucci relayed his understanding that McKinnon &

---

[5]"The use of the. . . wires to further the fraudulent scheme need only be 'incidental.'" Sawyer I, 85 F.3d at 723 n.6 (quoting United States v. Grandmaison, 77 F.3d 555, 566 (1st Cir. 1996)).

Harwood would receive $500,000 for each of the following two years, with the payment escalating to $1 million per year for three years if Lincoln Park received approval for additional machines. (Gov't Ex. 37.) Count VI pertains to a fax where Bucci warned that, without an incentive to "McKinnon's office," the likelihood of obtaining legislative approval for additional machines was minimal. (Gov't Ex. 39.) Finally, the fax described in Count IX noted Bucci's understanding that McKinnon & Harwood would receive $41,666 monthly in 2001. (Gov't Ex. 48.)

The government also submitted the faxes identified in the counts of honest services wire fraud of which Potter was convicted, specifically Counts III, V, and X, along with evidence that Potter sent these faxes or caused them to be sent. The fax described in Count X bears a fax line suggesting that it was sent from Wembley PLC. While the faxes described in Counts III and V do not contain fax lines, circumstantial evidence was introduced to establish that they were sent or caused to be sent by Potter. Potter composed these faxes on Wembley PLC fax letterhead. Furthermore, Bucci responded to both of these faxes, also by way of fax. Potter's December 1, 2000, fax, the subject of Count III, summarized the meetings between Bucci and Potter on November 29-30, 2000. Bucci replied to this fax later that day, thanking Potter "for the synopsis of [his] visit" and discussing the particular McKinnon proposal set forth in Potter's fax. (Gov't Ex. 37.) Potter's December 4, 2000, fax, which is the subject of Count V, is directly quoted in Bucci's fax on the following day.

Furthermore, each of the Potter faxes concern the particular conditions of the payment to McKinnon & Harwood and they therefore could be found to be in furtherance of the scheme to defraud. Count III concerns the December 1, 2000, fax from Potter in which he recounted his

and Bucci's decision to pay McKinnon & Harwood $500,000 per year in 2001 and 2002, and $1 million per year in 2003, 2004, and 2005, provided that Lincoln Park obtained legislative approval for at least 1,000 new machines by 2002 and those machines were installed and generating revenue. (Gov't Ex. 35.) In the fax that is the subject of Count V, Potter wrote that he would "bring forward McKinnon's reward" once 1,000 additional machines were approved and operational. (Gov't Ex. 38.) The fax addressed in Count X contains the following statement: "I am happy that the McKinnon payments are as we agreed when we met...." (Gov't Ex. 49.)

The government therefore has introduced evidence that Defendants sent faxes in furtherance of their scheme to defraud. Consequently, when considered with the evidence of the existence of a scheme to defraud, a rational jury could find Defendants guilty on all counts of honest services wire fraud on which they were convicted.

3. Lincoln Park's Corporate Liability

Defendant Lincoln Park was convicted of conspiring to commit honest services wire fraud under Count I and of committing honest services wire fraud under Counts VI and IX. Lincoln Park asserts that the government failed to introduce sufficient evidence to find, beyond a reasonable doubt, that Defendant Bucci, Lincoln Park's General Manager, was acting on behalf of Lincoln Park at the time he committed the acts alleged in the indictment.

"A corporation may be convicted for the criminal acts of its agents, under a theory of respondeat superior." United States v. Cincotta, 689 F.2d 238, 241 (1st Cir.), cert. denied, 459 U.S. 991 (1982). To impose criminal liability on a corporate defendant for the acts of its agent, the government must prove beyond a reasonable doubt: (1) that the agent acted within the course

and scope of his employment; (2) that the acts committed by the agent were of the kind that he is authorized to perform; and (3) that the acts of the agent were motivated by an intent to benefit the corporation. See id. at 241-42. These elements must be established in addition to the elements of the substantive charges alleged in the indictment.

The evidence submitted during the government's case, when viewed in the light most favorable to the government, provides a sufficient basis from which a rational factfinder could find Lincoln Park guilty on Counts I, VI, and IX.

First, the evidence, when taken in light most favorable to the government, demonstrates that Bucci acted within the course and scope of his employment when engaging in the conspiracy and committing acts of honest services wire fraud. Sherman, the then President of Lincoln Park and CEO of Wembley USA, testified that Bucci, as General Manager of Lincoln Park, assumed primary responsibility for maintaining relationships with political figures in order to promote Lincoln Park's position on proposed legislation, particularly so that any legislative change would not decrease the percentage that Lincoln Park received from the VLT revenue. Consequently, when Bucci worked to provide McKinnon & Harwood with a multi-million dollar payment in order to further Lincoln Park's political goals of obtaining additional VLTs and new coin-operated slot machines, and preventing the establishment of an Indian casino, he was acting within the course and scope of his employment.

Second, a reasonable jury could find that Bucci's acts to secure the McKinnon payment were of the type that he was authorized by Lincoln Park to perform. Sherman testified that Bucci was empowered, and was even expected, to maintain political relationships. There is evidence that Bucci was explicitly authorized to maintain Lincoln Park's relationship with Harwood

that Bucci prepare a specific proposal regarding the payment to McKinnon & Harwood. Potter, in his capacity as CEO of Wembley PLC, parent company to both Wembley USA and Lincoln Park, ultimately was superior to Sherman, as is evidenced by Sherman's testimony that Potter had the authority to direct Sherman to issue checks on behalf of Wembley USA.

Furthermore, according to Lincoln Park's articles of incorporation, the three members of the Lincoln Park board of directors in 2000 were Potter, Sherman, and Elliott. (Gov't Ex. 115.) Sherman therefore only spoke for one-third of the Lincoln Park board when he instructed Bucci to cease any efforts to make a payment to McKinnon & Harwood; an equal fraction of the board, represented by Potter, did the opposite. As to the fraction of the board represented by Elliott, a reasonable jury could have found, from the evidence submitted during the government's case, that Elliott implicitly authorized the payment. Testimony from Potter and other evidence revealed that in early December 2000, Potter and Elliott together included a $600,000 payment to McKinnon & Harwood for "retainer/legal expenses" in the 2001 Wembley USA budget, along with the $360,000 already allocated to the firm for ordinary legal fees. Consequently, a reasonable jury could conclude that two out of the three members of the Lincoln Park board took some steps to advance and authorize the McKinnon payment.

Finally, a rational factfinder could determine that Bucci committed each of the essential elements of the offense with the intent to benefit the corporation rather than himself or someone else. When examining the numerous faxes sent by Bucci regarding the McKinnon payment, it is apparent that Bucci sought to advance the payment on Lincoln Park's behalf. On multiple occasions, Bucci stated his belief this payment would further Lincoln Park's future political goals. For instance, in his October 5, 2000, fax to Sherman, Bucci commented that Lincoln Park must worry about "exhausting friendships" when seeking proponents for its short-term goals, which included increasing the number of VLTs and introducing coin-to-coin machines. He wrote: "Our closest allies are not going to desert us, period. But, more importantly, the two action items are controversial, i.e. [sic] additional machines and coin. Whomever champions these issues will be on the firing line, for sure, in the media. At the risk of redundancy, I firmly believe that McKinnon's firm should be given a six figure check...." (Gov't Ex. 24.) In addition, Bucci wrote in his December 5, 2000, fax to Potter that "the chances for us to achieve extra machines in 2001 under your recommendation [which delivers payment to McKinnon upon the installation and operation of the additional VLTs rather than upon the legislative approval of the machines] are MINIMAL AT BEST." (Gov't Ex. 39.) These two faxes, in which Bucci expressly links the McKinnon payment to the approval of more machines for Lincoln Park, provide ample evidence for a reasonable jury to find that Bucci acted with the intent to benefit Lincoln Park.

B. Defendants' Renewed Motions for Judgment of Acquittal

Defendants renewed their motions for judgment of acquittal at the close of all evidence. In doing so, Defendants incorporated the arguments they made when moving for judgment of

jury to find Defendants guilty on all counts on which they were convicted. After considering all of the evidence introduced at trial, the Court finds no reason to alter that determination. The evidence submitted by all parties after the close of the government's case does no more in this instance than create additional questions of fact for the jury to weigh. The evidence, as a whole, is not sufficient to warrant a judgment for acquittal.

C. Defendants' Renewed Motions for Judgment of Acquittal Following the Jury's Verdict

Defendants again renewed their motions for judgment of acquittal after the jury returned its verdicts. As discussed supra, the Court finds that the evidence introduced at trial would allow a rational jury to convict Defendants on all counts where the jury returned a verdict of guilty. Therefore, Defendants' renewed motions for judgment of acquittal following the jury's verdicts are denied.

## III. CONCLUSION

For the reasons set forth above, Defendants' motions for judgment of acquittal and renewed motions for judgment of acquittal are DENIED.

SO ORDERED.

Mary M. Lisi
United States District Judge
September 27, 2005